UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re<br><br>SKAGIT GARDENS, INC. *et al.*[1]<br>3100 Old Highway 99 South<br>Mount Vernon, WA 98273<br>80-0161154,<br><br>          Debtors. | Lead Case No. 16-12879<br><br>MOTION FOR: ORDER (i) SCHEDULING HEARING TO APPROVE ASSET PURCHASE AGREEMENT; (ii) APPROVING FORM AND MANNER OF NOTICE; (iii) APPROVING BREAK-UP FEE; (iv) APPROVING BIDDING PROCEDURES AND (v) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS<br><br>- AND -<br><br>MOTION FOR ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR; APPROVING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS |

---

[1] The Debtors are Skagit Gardens, Inc., Skagit RESPE LLC, Skagit TPPSPE LLC, and Skagit Real Estate Holdings, LLC.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Debtors Skagit Gardens, Inc. ("Skagit Gardens"), Skagit Real Estate Holdings, LLC ("SREH"), Skagit RESPE LLC ("Skagit RESPE"), and Skagit TPPSPE LLC ("Skagit TPPSPE"), debtors-in-possession herein (each, a "Debtor," and together, the "Debtors"), have signed an Asset Purchase Agreement with Early Morning LLC, a Delaware limited liability company ("Stalking Horse Bidder" or "Early Morning"), which provides for the sale substantially all of their assets to Early Morning as a going concern ("Purchase Agreement"). Early Morning intends to continue to operate Skagit Gardens' business, including continued employment for Skagit Gardens' employees, and is prepared to close the sale on or before July 8, 2016, subject to this Court's approval and standard bidding procedures.

Debtors now move the Court for two orders, which will be entered in a two step procedure, with the Procedures Order being entered first, and the Sale Order being entered at a second hearing, after the bidding and any auction process has been completed:

**Bidding and Contract Assignment/Assumption Procedures Order**

The first order (the "**Procedures Order**") that the Debtors seek from the Court would do the following:

> (i)      schedule a hearing to authorize and approve the sale of all, or substantially all of the Debtors' assets (the "Acquired Assets"), and to approve assumption and assignment of the Assumed Contracts as set forth in the Purchase Agreement (the "Sale Hearing"), and approving the form and manner of notice thereof;

> (ii)      approve (a) Early Morning, LLC as the "stalking horse bidder", (b) the Break-Up Fee and the Overbid Protections and payment thereof under the terms set forth in the Purchase Agreement;

> (iii)      set a deadline and establishing requirements and procedures for competing offerors to submit Qualifying Bids;

> (iv)      set a date for the filing and service of objections, if any, to the relief requested in this Motion; and

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev

(v)     set deadlines and establishing procedures for objections to (a) the Debtors' proposed Cure Costs for Assumed Contracts, (b) the proposed assumption and assignment of Assumed Contracts, and (c) determining any disputes concerning Cure Costs, and/or the assumption and assignment of Assumed Contracts.

**Sale Order**

In addition to the Procedures Order, the Debtors move the Court the entry of an order (the "Sale Order") that would do the following:

(i)     authorize and approve the Purchase Agreement; and

(ii)    authorize the sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts under the terms and conditions of the Purchase Agreement to the Stalking Horse Bidder, or another Successful Bidder (as defined herein), free and clear of all liens, claims, interests, charges and encumbrances, and authorize any additional relief consistent with the foregoing and as necessary to allow the proposed transactions to be consummated ("Relief Requested").

The Debtors also request that the Court find that (i) notice of these motions was appropriate and was properly served in accordance with applicable Bankruptcy Code provisions, the Bankruptcy Rules, and orders of this Court; (ii) the proposed Sale is in the best interests of the Debtors and their estates and creditors; (iii) the proposed Sale is being proposed and, if approved will be consummated as provided in Bankruptcy Code Section 363(m); and (iv) the Stalking Horse Bidder or the Alternative Bidder, if any, is not an insider or an affiliate of any of the Debtors.

This Motion is based upon the files and records herein, the Declaration of Mark Buchholz in Support of Emergency First Day Motions (Docket No. 21) (the "Buchholz First Day Declaration"), the accompanying Declaration of Mark Buchholz (the "Buchholz Sale Declaration"), the accompanying Declaration of Hannah Schmidt in Support of this Motion (the "Schmidt Sale

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Declaration"), and the accompanying Declaration of Eric Hamant in Support of this Motion (the "Hamant Sale Declaration").

## I.    FACTUAL BACKGROUND

### A.    The Debtors and Their Business

The Debtors commenced this case on May 27, 2016 (the "Petition Date"), have retained control over their assets, and continue to operate their businesses pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

Founded in 1966 and headquartered in Mount Vernon, Washington, Skagit Gardens (also the "Company") is a wholesale nursery that grows two categories of plants, finished plants and plugs/liners, each grown for different types of customers. Buchholz First Day Decl. at ¶ 3. Finished plants are sold and delivered to independent garden centers, retailers, and landscapers throughout North America. Id. "Plugs and liners" are essentially high quality starts that Skagit Gardens sells either through brokers or directly to greenhouses and nurseries for transplanting. The greenhouses and nurseries then produce the finished plants for sale to their customers. Skagit Gardens delivers its products on its own trucks, by common carriers, plane, and even barge. Id.

Skagit Gardens maintains a steady workforce of approximately 150 employees, with a seasonal high of 275 – 300 employees, making it one of the 20 largest employers in Skagit County. See Buchholz First Day Decl., ¶ 6, Ex. A. Annual gross revenues are typically $20 – 25 million. Id. at ¶ 7.

For reasons discussed in more detail below, about six months ago, Skagit Gardens found it necessary to market the Company for sale. It has successfully located an interested buyer, its Stalking Horse Bidder, and extensively negotiated the terms of a sale. Buchholz First Day Decl. Skagit Gardens' business is seasonal in nature, with its primary growing and sale season beginning early in

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the year and running through August.  Id. at ¶ 9.  It filed this case in order to consummate a sale transaction quickly, thereby capturing as much value as possible during the current growing season. This approach will maximize the value of the business for the benefit of all of the Debtors' constituents, including their secured lenders, employees, and vendors and suppliers.  Id.

Skagit Gardens owns two direct subsidiaries, SREH Skagit TPPSPE.  Buchholz First Day Decl.  In turn, SREH wholly owns Skagit RESPE.  Id.  Otherwise, neither SREH nor Skagit TPPSPE currently own any assets.  Id.  At some point in the past, Skagit TPPSPE owned some personal property used by Skagit Gardens in its operations, apparently as part of the financing structure previously in place.  Today, it holds no assets, and Skagit Gardens owns all of the personal property used in its operations.  Id.  Skagit TPPSPE is included in these cases due to the historical structure and to insure, to the Buyer's satisfaction, that it is acquiring all of the assets essential to the Company's operations.  Id.

Skagit Gardens operates in two locations, both owned by RESPE.  Buchholz First Day Decl. at ¶ 12.  The Debtors' main offices and ten acres of greenhouses are located on 21.59 acres at 3100 Old Highway 99 South, Mount Vernon, Washington (the "Highway 99 Property").  Id.  The second location includes approximately three acres of greenhouses and 17 acres of outdoor growing beds, located at 14207 River Bend Road, Mount Vernon, Washington (the "River Bend Property").  Id.

**B.**    **Sale and Financing Efforts**

In 2008, Aequitas Capital Group ("Aequitas Capital") purchased Skagit Gardens.  Buchholz First Day Decl. at ¶ 13.  Over the years, Skagit Gardens' financial performance has been uneven, with some years profitable and some not.  Id.

In early 2014, the Debtors engaged Hamstreet and Associates ("Hamstreet") to help restructure operations and to obtain replacement financing for the Debtors' line of credit provider, then Wells

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Fargo.  Buchholz First Day Decl. at ¶ 14.  Working with Hamstreet, Skagit Gardens obtained a new line of credit from NewStar Business Credit, as Administrative Agent and Lender ("NewStar"), in late 2014.  Id.  The Company generated positive EBITDA of $933,000 in 2014.  Buchholz First Day Decl. at ¶ 15.  Financial results were uneven during 2015, in part due to extreme weather conditions, including a prolonged drought in the West combined with a late spring in the inter-mountain region, and Skagit Garden again encountered financial struggles, ending 2015 with a slightly negative EBITDA of ($141,000).  Id.

In the fall of 2015, NewStar conditioned its continued financing of Skagit Gardens on the support funding by Aequitas Capital of a $1.2 million seasonal line of credit ("Aequitas Seasonal Line").  Buchholz First Day Decl. at ¶ 16.  The plan was for the Aequitas Seasonal Line to be available beginning in January 2016 for Skagit Gardens' use in ramping up for the January through August growing season.  Id.  As discussed below, Aequitas Capital and its affiliates had previously loaned over $11 million to the Company over the years, which amounts were secured by security interests junior and contractually subordinated to NewStar.  Buchholz First Day Decl. at ¶ 17.

In late 2015, Skagit Gardens was approached by Early Morning, which was interested in acquiring the Company as a going concern.  Buchholz First Day Decl. at ¶ 18.  Early Morning is a subsidiary of a larger company called Gardens Alive, a privately-owned and well-respected catalog company that sells plants and other garden supplies.  Buchholz Sale Decl.  At the time (late 2015), Aequitas refused to consent to a potential sale because it failed to provide a distribution to Aequitas on its secured debt or its equity.  Consequently, discussions with Early Morning ended.  Id.

Ultimately, Aequitas advanced only $340,000 of the committed $1.2 million Aequitas Seasonal Line.  Buchholz First Day Decl. at ¶ 19.  Aequitas' underfunding created severe cash pressures and shortfalls for Skagit Gardens as it headed into its critical growing season.  Id.  In late

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

January 2016, Aequitas informed Skagit Gardens that it was incurring its own severe financial challenges, had made significant layoffs, and would be unable to make any further advances on the Aequitas Seasonal Line. Buchholz First Day Decl. at ¶ 20.

In February 2016, faced with insufficient working capital in the short and long term, Skagit Gardens renewed discussions with Early Morning and began negotiating the terms of a sale contemplated to close outside of a bankruptcy. Buchholz First Day Decl. at ¶ 21. The parties were close the terms of a final, agreed Asset Purchase Agreement that could be consummated without the need for a bankruptcy. Id.

Unfortunately, Aequitas' financial woes came to a head in early March 2016. Buchholz First Day Decl. at ¶ 22. On March 10, 2016, the Securities and Exchange Commission ("SEC") filed a lawsuit against Aequitas Management, LLC and numerous affiliates in the United States District Court for the District of Oregon, Case No. 3:16-cv-00438-PK. A Stipulated Order Appointing Receiver was quickly entered, and Ron Greenspan of FTI Consulting, Inc. was appointed receiver (the "Aequitas Receiver") over the various Aequitas entities ("Aequitas Receivership"). The Debtors are not receivership defendants, relief defendants, or otherwise parties to the Aequitas Receivership. The Aequitas Receiver effectively stands in the shoes of the Aequitas entities as shareholder and subordinated lender to Skagit Gardens. Skagit Gardens' management and professionals have kept the Aequitas Receiver apprised of the sale efforts and potential need for a Chapter 11 to complete those sale efforts. Id.

In light of the complexities created by the Aequitas Receivership, Early Morning agreed to proceed with sale negotiations only in the context of a Chapter 11 filing by the Debtors, with the intended sale to be approved by an order of the Bankruptcy Court pursuant to Bankruptcy Code §§ 363 and 365. This meant a significant shift in the structure and approach of the transaction, which

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

required a new round of negotiations and drafting to address the procedures and additional oversight and process of a Chapter 11. Both Skagit Gardens and Early Morning incurred significant cost in these efforts that would have been unnecessary has the Aequitas Receivership not been commenced. Early Morning communicated early in this phase of the process that it would require a break-up fee and overbid protections in order to sign an agreement as a stalking horse. Buchholz Sale Decl.

Extensive negotiations ensued between the parties over the terms of a purchase and sale agreement. Buchholz Sale Decl. At one point in mid-late March, the parties reached an impasse regarding the economic terms of a transaction, and negotiations halted for a week or more. Id. Ultimately, after meaningful back and forth discussions, Early Morning agreed to an increase in the price and the parties resumed work on the terms of a sale. Id.

Throughout the negotiations, numerous issues required compromise, and both parties did so, working to find common ground. The ultimate agreement is a product of extensive, time consuming, and intense negotiations completed over several months. Id. As noted above, Early Morning compromised on the price it would pay, and the parties also heavily negotiated other terms that resulted in compromises by both, including: the amount and terms of the Break-Up Fee and Overbid Protections, the terms of the bidding procedures, the formula and process for determining the Working Capital Adjustment, how continued employment would be addressed, and who would pay the transfer taxes, to name a few. Id.

Throughout the negotiations, Skagit Gardens kept its working capital lender, Sterling Bank, formerly known as NewStar, apprised of the negotiations and the progress. Id. In addition, after the exclusivity period with Early Morning expired, Skagit Gardens and its professionals actively reached out to a number of other potential buyers. Buchholz First Day Decl. at ¶ 26. In total, they contacted 15 parties to gauge interest, 12 of which signed Non-Disclosure Agreements (each, an "NDA") and

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 8

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

received due diligence information.  Of those, the Debtors' management and professionals had substantive meetings and conversations with at least 9, and 7 have expressed serious interest in purchasing Skagit Gardens.  Id.  The Debtors communicated to each that the sale process would be completed through a Chapter 11, with an initial stalking horse, against which competitive overbids could be submitted with an auction to determine the highest and best offer.  Id.  As part of these discussions with interested buyers, the Debtors have informed them that the process will move very quickly with competitive bids expected to be due in the latter part of June.  Id.

At one point, the Company discussed with Sterling whether an investment banker should be hired to aid in the marketing and sales efforts.  Buchholz Sale Decl.  While Sterling deferred to the Company on the ultimate decision, it did not believe an investment banker would add value to the process, especially in light of the fact that the universe of likely buyers had been identified and contacted.  Id.

The Debtors filed these cases to complete the sales process and to consummate the highest and best transaction for the benefit of existing secured lenders, unsecured creditors, employees, and vendors/suppliers.  Buchholz First Day Decl. at ¶ 28.  The proposed Sale delivers a substantial value to the creditor constituencies in a variety of ways, including:

    a.    Estimated distribution secured lenders Sterling Bank and Bank of the West (discussed below) projected at approximately 85% of their debt, with the net sales proceeds of the proposed Sale being distributed to them on a pro rata basis;

    b.    Benefits to unsecured creditors in the form of payment of contract cure costs estimated to be $150,000 and payment of 503(b)(9) claims estimated to be $105,000;

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

c.  Benefits to employees in the payment/assumption of accrued paid time off ("PTO") estimated to be approximately $180,000;

d.  Benefits to employees by providing for continued employment post-closing; and

e.  Benefits to unsecured vendors/suppliers through a continuing business relationship with the operating company post-closing.  Id.

If competitive bids are received, as appears quite possible, the benefits to creditors will only increase.  Id.  Selling the Debtors' business and assets as a going concern delivers maximum value to the various constituents.  Breaking it apart or liquidating it will do harm to all of the creditors, including the secured lenders, as discussed below.

## C.  Debt Structure

1.  **Bank of the West.**  In 2008, SREH and Skagit RESPE entered into a Credit Agreement with Bank of the West ("BOTW") pursuant to which BOTW extended a term loan to SREH and Skagit RESPE in the maximum amount of $5,655,000 (the "BOTW Term Loan").  Buchholz First Day Decl., Ex. B.  The BOTW Term Loan is secured by a first position deed of trust against the Highway 99 Property and the River Bend Property.  Buchholz First Day Decl., Ex. C.  Skagit Gardens guaranteed the BOTW Term Loan.  Buchholz First Day Decl., Ex. D.  As of the Petition Date, the outstanding balance on the BOTW Term Loan was approximately $2,764,636.  Buchholz First Day Decl. at ¶ 32.

2.  **Sterling Bank f/k/a NewStar.**  In late 2014, Skagit Gardens entered into a Loan and Security Agreement with NewStar which provides for a revolving loan and a swing loan (together, the "NewStar Loans").  Buchholz First Day Decl., Ex. E.  Skagit Gardens granted NewStar a security interest in substantially all of its personal property.  SREH, Skagit TPPSPE and Skagit RESPE were

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

each additional credit parties to the Loan and Security Agreement.  Skagit Gardens, SREH, Skagit TPPSPE and RESPE each executed a guaranty and a security agreement in favor of NewStar, with each pledging substantially all of its personal property (the "Prepetition Collateral"), including inventory and receivables, and the cash proceeds thereof (the "Cash Collateral"), to secure the NewStar Loans.  Buchholz First Day Decl. Exs. F and G.  NewStar filed UCC-1 financing statements with respect to the security interests granted by each entity.  Id., Ex H.

In addition, Skagit RESPE granted NewStar a deed of trust, junior to BOTW's deeds of trust, against both the Highway 99 Property and the River Bend Property which was recorded in Skagit County on December 9, 2014.  Buchholz First Day Decl., Ex. I.

As of the morning of the Petition Date, the outstanding balance of the NewStar Loans was approximately $5,235,042.10.  Buchholz First Day Decl. at ¶ 38.  Prepetition, Sterling National Bank ("Sterling Bank") acquired the NewStar Loans.  Id.

**3.     Aequitas**

a.     2010 Business Loan Agreement.  In November 2010, Skagit Gardens entered into a Business Loan Agreement with Aequitas Capital's affiliate, Aequitas Commercial Finance, LLC ("Aequitas Commercial") pursuant to which Aequitas Commercial loaned Skagit Gardens $1,650,000 (the "2010 Aequitas Loan").  Buchholz First Day Decl., Exs. K and L.  Through a series of amendments, the 2010 Aequitas Loan was increased to up to $9,000,000.  Buchholz First Day Decl., Ex. K.  Skagit Gardens and TPPSPE executed security agreements pledging substantially all of their personal property to secure the 2010 Aequitas Loan as well as any other amounts owed by Skagit Gardens to any affiliate of Aequitas Commercial.  Buchholz First Day Decl., Exs M and N.  Aequitas Commercial filed UCC-1 financing statements.  Buchholz First Day Decl., Ex. O.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 11

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

As of the Petition Date, the asserted amount owing under the 2010 Aequitas Loan was approximately $11,440,361.  Buchholz First Day Decl. at ¶ 44.  Of amounts advanced by Aequitas, $6,378,219 was advance to pay off debt from third parties originally used by Aequitas to purchase Skagit Gardens, and $5,114,280 was provided as working capital to Skagit Gardens.  Id.

   b. <u>January 2016 Agreement re Seasonal Line</u>.  As previously discussed, in January 2016, Skagit Gardens and Aequitas Commercial entered into a second Business Loan Agreement (the "<u>Aequitas January 2016 Agreement</u>") pursuant to which Aequitas agreed to loan Skagit Gardens $1,200,000 (the Seasonal Line discussed previously).  Buchholz First Day Decl., Exs. P and Q.  A second UCC-1 financing statement was filed in favor of Aequitas with the Washington Secretary of State on December 29, 2015.  Buchholz First Day Decl., Ex. R.  Aequitas advanced only a portion of the committed funds, or $340,000.  Buchholz First Day Decl. at ¶ 49.

   c. <u>Subordination Agreement</u>.  In connection with the NewStar financing, Aequitas Commercial executed a Subordination and Intercreditor Agreement.  Buchholz First Day Decl., Ex. S.  Under the Agreement, Aequitas Commercial subordinated its security interest in Skagit Gardens' assets to the security interests in favor of NewStar's security interests and also subordinated payment of its loans to the full payment of the NewStar loans.  Id.

  **4.** **Agricredit.**  Skagit Gardens entered into a Lease Agreement with Agricredit Acceptance, LLC ("<u>Agricredit</u>") pursuant to which Skagit Gardens leases tractors.  Buchholz First Day Decl., Ex. T.   UCC-1 financing statements with respect to the tractors were filed in Skagit County on March 31, 2015 and January 20, 2016.  Buchholz First Day Decl., Ex. U.

  **5.** **503(b)(9) Claims.**  Skagit Gardens estimates that pursuant to Bankruptcy Code § 503(b)(9), as of the Petition Date there is approximately $105,000 owed to creditors on account of the delivery of goods to Skagit Gardens within 20 days of the Petition Date which remain unpaid

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 12

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

("503(b)(9) Claims").  Declaration of Hannah Schmidt in Support of Motion to Use Cash Collateral

("Schmidt Declaration").  The Company's Cash Collateral Budget provides for the creation of a

reserve to be funded during the case in order to pay the allowed 503(b)(9) Claims.

**D.**     **Terms of Proposed Sale**

The proposed Sale to Early Morning provides for the best outcome to the estate and its

creditors and satisfies the Debtors' objective of continuing the business of Skagit Gardens rather than

closing and liquidating.

Following is a summary of the material terms of the Purchase Agreement between Debtors and

the Stalking Horse Bidder[2]:

**1.**     **Assets to be Purchased.**  The assets to be purchased ("Acquired Assets") _include_, but

are not limited to, all of Debtors' tangible and intangible assets, including inventory, accounts

receivable and real property, but excluding (a) cash and (b) bank accounts identified in the Purchase

Agreement.

**2.**     **Contracts.**  The Acquired Assets include the assumption by the Debtors and

assignment to the Stalking Horse Bidder of all of Debtors' rights and interests in and to certain

executory contracts and unexpired leases which shall be identified and such assumption and

assignment designated by the Stalking Horse Bidder in accordance with the procedures discussed in

this Motion.

**3.**     **Consideration**.  Base Cash Consideration of $6,227,500, plus (a) payment/assumption

of up to $450,000 of employment liabilities, including wages and accrued PTO to employees; (b) the

---

[2] This description of the terms of the Purchase Agreement is intended solely to provide the Court and interested parties with an overview of the significant terms thereof.  The Court and interested parties are respectfully referred to the Purchase Agreement for the complete terms of the Asset Sale.  Capitalized terms not defined in this Motion have the meanings as defined in the Purchase Agreement.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 13

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  Cure Costs relating to the Assumed Contracts; <u>subject to</u> an increase/decrease based on a Working

2  Capital Adjustment determined as of the Closing Date.

3      **4.      Stalking Horse Bidder Deposit.**  $311,375.

4      **5.      Conditions**.  Consummation of the proposed Sale under the Purchase Agreement is

5  conditioned upon entry of the Procedures Order and Sale Order, which Sale Order shall be submitted

6  to the Court in final proposed form prior to the Sale Hearing, attached hereto in proposed form as

7  Exhibits A and B.[3]  There are no financing or due diligence contingencies.

8      **6.      Higher and Better Offers.**  The Purchase Agreement is subject to the submission by

9  third parties of higher or better offers as set forth in the Procedures Order.  In order for other bidders

10  to be a Qualifying Bidder under the Purchase Agreement, they must submit a bid worth $300,000

11  more than the Stalking Horse Bidders offer.  As discussed below, the $300,000 includes payment of

12  the $200,000 Break-Up Fee, $84,500 for the EM Consignment Inventory, and an increase in value to

13  the Debtors' estates of $15,500.

14      **7.      Break-Up Fee/Overbid Protections.**  The Purchase Agreement provides that if it is

15  terminated for any other reason than the Stalking Horse Bidder's breach or because the Court

16  approves the proposed Sale of the assets to a Successful Bidder other than the Stalking Horse Bidder,

17  the Debtors shall pay a break-up fee to the Stalking Horse Bidder in the amount of $200,000 (the

18  "<u>Break-Up Fee</u>").  In addition, in March 2016, the Stalking Horse Bidder purchased inventory for

19  $84,500 that is valuable to Skagit Gardens business and provided the inventory to Skagit Gardens

20  pursuant to a Consignment Agreement (the "<u>EM Consignment Agreement</u>").  Buchholz Sale Decl.,

21  _____

22      [3] The forms of the Procedures Order and the Sale Order may be modified, as the Stalking Horse Bidder
   has not yet approved its form and a third party Successful Bidder will likely have revisions, as well.  The

23  Debtors intend to file the final form of the Procedures Order and the Sale Order prior to the respective hearings
   and/or advise the Court of any material changes at the hearings.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 14

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev

Ex B.  In the event that Early Morning is not the successful buyer of Skagit Gardens' assets, the Purchase Agreement provides than a qualified overbid must include $84,500 to purchase the inventory under the EM Consignment Agreement, which amount is to be paid to Early Morning from the deposit of the Successful Bidder in addition to the Break-Up Fee.  The wholesale value of this EM Consignment Inventory is estimated to be $150,000-$190,000 as it is cared for and matures.  Schmidt Sale Decl.; Hamant Sale Decl.

## II.  RELIEF REQUESTED

### A.  Approval of Proposed Sale

#### 1.  Asset Sale Satisfies the Requirements of 11 U.S.C. §363.

Section 363(b) of the Bankruptcy Code authorizes a debtor to sell its assets outside of the ordinary course of business.  Each of the following elements must be met: (i) a sound business reason exists for the proposed transaction; (ii) the proposed Sale has been proposed in good faith; (iii) the proposed Sale price is fair and reasonable; and (iv) accurate and reasonable notice has been provided of the transaction.[4]  Here, the proposed Sale meets each of these four factors.

##### a.  The Proposed Sale is Supported by Sound Business Reasons.  The proposed Sale and the procedures related thereto (as further detailed below) are supported by ample business justification and are reasonable and appropriate under the circumstances of these administratively consolidated Chapter 11 cases.  Based upon their analysis of their existing and future business prospects, the Debtors have concluded that, given their current, severe liquidity crisis and the absence

---

[4] In Stephens Industries, Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983); Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268 (S.D.N Y. 1996); In re Equity Management Systems, 149 B.R. 120 (Bankr.S.D.Iowa 1993); In re Channel One Communications, Inc., 117 B.R. 493 (Bankr.E.D.Mo. 1990).

.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 15

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

of a source of capital for continued operations, the proposed Sale represents the only viable way to maximize the value of the Debtors' estates. A going concern sale, such as the proposed Sale, will generate substantial recoveries for secured and unsecured creditors, preserve the substantial goodwill of Debtors' business, maintain valuable relationships with customers, preserve jobs, and avoid a liquidation of the Debtors' assets at severely depressed, "fire-sale" prices. Thus, the proposed Sale will maximize the value for the Debtors' estates and creditors.

        **b.**    **The Proposed Sale Has Been Proposed in Good Faith.** "The requirement that a buyer act in good faith … speaks to the integrity of his conduct in the course of the sale proceedings." In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986). "Typically, the misconduct that would destroy a buyer's good faith status at a judicial sale involves fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id. Here, the Purchase Agreement was proposed, negotiated, and entered into in good faith after arms-length bargaining by the parties. The arms-length negotiation of the Purchase Agreement was extensive and protracted between the Debtors and the Stalking Horse Bidder (and their respective advisors), including substantial concessions made by each party throughout the negotiations, including price increases, reductions in the Break-Up Fee, and agreement by the Buyer to pay the real estate excise taxes and sales taxes that may be due as a result of the Sale. All of the terms of the proposed Sale are disclosed. No side agreements exist between or among any party to the transaction and the Debtors' insiders, and there is no relationship between the Debtors and the Stalking Horse Bidder.

     Thus, Stalking Horse Bidder is a good faith purchaser within the meaning of § 363(m) of the Bankruptcy Code and should be entitled to all of the protections thereof.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 16

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1     Further, the proposed Sale is subject to higher or better offers and the Debtors intend to

2  provide notice of the proposed Sale to all potential bidders as more fully discussed below.  Finally, the

3  Debtors have fully disclosed, and are requesting herein the Court's approval of, all of the terms and

4  conditions of the proposed Sale, notice and bidding procedures.  Accordingly, the proposed Sale has

5  been proposed, and is, in good faith.

6          **c.**          **The Purchase Price is Fair and Reasonable.**  Fortunately, the Debtors had the

7  opportunity to market their business for sale pre-petition, including engaging in extensive exchanges

8  and communications with as many as 15 other potential buyers, in addition to Early Morning.  The

9  sale discussions and negotiations with Early Morning spanned nearly 6 months, and the Sale is a

10  product of much give and take between the parties.  As discussed in detail in the Buchholz Sale

11  Declaration, there are several potential buyers who have expressed a strong interest in acquiring

12  Skagit Gardens' business.  Mr. Buchholz prepared each for a bankruptcy sale process on a fast-

13  moving timeline.  In short, the business has been extensively marketed and subjected to prospective

14  buyers.  The proposed Sale reflects an arms length, protracted negotiation.  Ultimately, the market is

15  the best determination of value.

16          In addition, the proposed Sale exceeds the true liquidation value of the assets involved here,

17  taking into account issues related to both the real estate assets and the working capital assets.  First,

18  the Skagit RESPE real estate is agricultural property, as defined in RCW 84.34.030(2).  Thus, any

19  effort to realize on the existing deeds of trust against the real estate will require a judicial foreclosure,

20  with a resulting one year redemption period before it can be sold.  RCW 61.24.030(2).  In addition,

21  both properties contain significant improvements, primarily in the form of greenhouses, irrigation

22  systems, and other buildings that would present significant costs to monitor during a holding period

23  and to demolish and remove prior to sale of the property.  The cost to remove these structures to make

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 17

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the property usable for commercial purposes will have significant negative impact on recovery. If these properties were to be protected from damage due to winter weather and trespass and vandalism, then utility and security services would need to be maintained year round. These services would be greater than at a typical agricultural property. Schmidt Sale Decl. Finally, it is believed that the marketing time for sale of the real estate could be as long as 2 years. Id. In short, any net recovery from the real estate collateral will be delayed 2 - 3 years, and require substantial annual cost to complete the judicial foreclosure process, maintain and secure the real estate in the ensuing 2 - 3 years (insurance, security,etc.), and ultimately the decommissioning of the property, as noted above. Finally, if use of the real estate is no longer agricultural, there appears to be a tax recapture of approximately $660,000. These factors lead to the conclusion that the net value of the real estate could well be less in a liquidation scenario than the proposed 85% recovery to BOTW under the proposed Sale.

With respect to the working capital collateral (inventory and accounts receivable), a fire sale liquidation, with contemporaneous closing of the business, would rapidly and unpredictable reduce the value generated through quick sale of the plant inventory. Schmidt Sale Decl. It would be challenging to continue to care for the growing plant inventory. In addition, rather than selling over time, a bulk sale of the inventory would mean a deep discount from current valuations. Id. Finally, efforts to recover accounts receivable will be hampered by lack of Company personnel to handle the efforts, as well as by customers who lack the incentive to pay or pay timely. As with the real estate assets, a true fire-sale liquidation would likely generate less for Sterling Bank than the projected 85% under the proposed Sale.

Ultimately, the proposed Sale delivers higher recoveries to all creditors, including the secured lenders, and delivers it much more quickly, than any other alternative. All of which leads to the

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 18

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

conclusion that the proposed Sale is for a fair and reasonable price, and the prospect for higher and better offers through a bidding process further supports this conclusion.

### 2. The Requirements of 11 U.S.C. § 363(f)

Section 363(f) of the Bankruptcy Code provides:

> (f)    The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> > (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2)    such entity consents;
> >
> > (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4)    such interest is in bona fide dispute; or
> >
> > (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Thus, a sale may be approved, even over the objection of a secured creditor, based on the provisions of § 363(f). In re Jolan, 403 B.R. 866 (Bankr. W.D. Wash. 2009). In addition, Washington receivership statutes provide for the sale of assets free and clear of interests, as contemplated by § 363(f)(1). See RCW 7.60.260.

The Debtors are unaware of any liens, claims, interests or encumbrances on the assets to be sold except as disclosed in Schedule D of its bankruptcy schedules. Accordingly, the Debtors seek the entry of a Sale Order authorizing the proposed Sale pursuant to §363.

### B. The Bidding Procedures, Break-Up Fee, and Overbid Protections

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING PROCEDURES – Page 19

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

The proposed Sale is contractually subject to the Debtors' receipt of higher and better offers through a bidding and auction process.  The Debtors seek authority to implement procedures to ensure that Debtors' estate will obtain the best return possible.  Thus, the Debtors request that the Court enter a Procedures Order approving the following bidding procedures (the "Bidding Procedures") in connection with the Purchase Agreement and the proposed Sale to the Stalking Horse Bidder.  The proposed Sale is subject to competitive bidding as set forth herein and approval by the Court at a hearing under §§ 363 and 365 of the Bankruptcy Code (the "Sale Hearing").  The alternative bid provisions and related bid protections are designed to compensate the Stalking Horse Bidder for its efforts and agreements to date and the benefits conferred upon the Debtors, and to facilitate a full and fair process designed to maximize the value of the Acquired Assets for the benefit of Debtors' estates:

1.    <u>Notice of Procedures</u>.  Notice of the Motion, the Relief Requested and the deadlines for filing and serving objections thereto, and the procedures set forth herein shall be deemed good and sufficient if Debtors serve, within one business day after entry of the Procedures Order, by regular mail, this Motion and the Procedures Order upon (collectively, the "Notice Parties"):

    a.    the UST;

    b.    counsel for the Unsecured Creditors Committee, if any (the "Creditors Committee");

    c.    counsel for the Stalking Horse Bidder;

    d.    counsel for Sterling Bank and BOTW;

    e.    counsel for the Aequitas Receiver;

    f.    all parties who have filed with the Court a request for notices in this case;

    g.    all counterparties to executory contracts and unexpired leases of the Debtors;

    h.    all parties on the creditor mailing matrix; and

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 20

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev
Case 16-12879-CMA    Doc 33    Filed 05/31/16    Ent. 05/31/16 17:41:45    Pg. 20 of 32

i.    all persons or entities that have expressed to the Debtors an interest in acquiring the Acquired Assets and the Assumed Contracts during the past twelve months or which Debtors reasonably believe may have an interest in bidding for the Acquired Assets and the Assumed Contracts.

2.    <u>Bidding Procedures; Auction</u>.  Following entry of the Procedures Order, the Debtors shall be entitled to solicit additional offers for the Acquired Assets and the Assumed Contracts from prospective bidders (each, an "Alternative Bid") and, subject to the receipt from prospective bidders of appropriate confidentiality agreements, provide necessary and requested due diligence to such prospective bidders.  The Debtors propose the following terms and procedures to govern the submission of competing bids for the Acquired Assets and the Assumed Contracts, including the proposed dates set forth below:

a.    <u>Alternative Bid Deadline</u>.  Each Alternative Bid must be filed with the Court and served such that is actually received not later than 5:00 p.m. (PST) on June 24, 2016, which is two Business Days prior to the Auction (the "<u>Bid Deadline</u>"), and serve copies of the Alternative Bid on the Debtors and the Stalking Horse Bidder, and counsel for each.

b.    The Debtors shall immediately distribute a copy of each such Alternative Bid received to counsel for the Committee, counsel for each of the Secured Lenders, and counsel for the Aequitas Receiver.

c.    <u>Qualified Alternative Bid</u>.  The Debtors will consider an Alternative Bid only if the Alternative Bid is a "Qualifying Bid" as that term is defined by the Purchase Agreement (a "<u>Qualified Alternative Bid</u>").  Without limiting or altering the terms of the Purchase Agreement, to be a Qualified Alternative Bid, an Alternative Bid must:

(1)    identify the proponent of the Alternative Bid and an officer or representative who is fully and completely authorized in all respects to appear, act on behalf, and legally bind such proponent (an "<u>Authorized Representative</u>");

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 21

Bush Kornfeld llp
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev
Case 16-12879-CMA    Doc 33    Filed 05/31/16    Ent. 05/31/16 17:41:45    Pg. 21 of 32

(2)     provide for the purchase/and or acquisition of some or all of the Acquired Assets, which must include the EC Consignment Inventory, and shall otherwise be on the substantially the same or better terms as those set forth in the Purchase Agreement, in the Sellers reasonable discretion, provided, however that an Alternative Bid shall not provide for the payment of a Break-Up Fee or Overbid Protections (i.e., no bidders other than the Stalking Horse Bidder will be entitled to receive any Break-Up Fee and/or any reimbursement of expenses or transaction costs);

(3)     identify the Liabilities to be assumed, if any, and the Assumed Contracts;

(4)     be accompanied by an executed asset purchase agreement in the form substantially the same as the Purchase Agreement, except that the structure may be changed so long as the value delivered to the Sellers' bankruptcy estate(s) for distribution to their creditors is at least $300,000 more than that provided by the Purchase Agreement, including the Break-Up Fee and the EM Overbid Component,

(5)     set forth the purchase price, payable in cash, which purchase price and value to the Debtors' estates and creditors, when combined with the value of any assets to be excluded from the purchase that are currently included as Acquired Assets in the Purchase Agreement, shall be higher and better than the Purchase Price such that the value to the Debtors' bankruptcy estates and creditors exceeds the Purchase Price by at least $300,000, including the Break-Up Fee and the EM Overbid Component;

(6)     be accompanied by a cash deposit by cashier's or certified check or contemporaneously submitted by wire via wire instructions to be provided at bidder's written request by counsel for the Debtors at the contact information set forth in the Procedures Order, in the amount of $500,000 of the proposed purchase price, refundable in the event the prospective bidder is not the ultimate purchaser for any reason other than such prospective bidder's breach of any purchase agreement with the Debtors approved by the Court, and to be held in trust by Bush Kornfeld LLP, the Debtors' counsel (the "Cash Deposit");

(7)     be a firm offer and, not contain any contingencies, other than those contained in the Purchase Agreement, to the validity, effectiveness or binding nature of the offer, including, without limitation, contingencies for financings, due diligence or inspection;

(8)     be accompanied by financial information for the prospective bidder, including but not limited to financial statements including the

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 22

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

prospective bidder's balance sheet sufficient to enable the Debtors, the Creditors Committee, the Secured Lenders, the Aequitas Receiver, and/or counsel for the Stalking Horse Bidder to determine such bidder's creditworthiness and ability to pay the purchase price and actually close a sale of the identified Acquired Assets, provided however, determination that the bidder has met this qualification shall be in the sole reasonable discretion of the Debtors;

(9)    be open and irrevocable through the conclusion of the Final Hearing, unless extended by agreement of the parties.

d.    <u>Auction, Bidding Increments, and Bids Remaining Open</u>. If the Debtors receive one or more Qualified Alternative Bids, the Debtors shall conduct an auction (the "Auction") at the offices of Bush Strout & Kornfeld, 601 Union St., #5000, Seattle, WA 98101, on June 28, 2016, beginning at 10:00 a.m. (PST) or such later time and date and/or such other place as the Debtors shall notify all bidders who have submitted Qualified Alternative Bids (such persons are referred to as "Qualified Alternative Bidders") and the Stalking Horse Bidder. The following procedures will apply:

(1)    Only the following parties and their counsel shall be permitted to attend the Auction: the Stalking Horse Bidder, the Debtors, chair of the Creditors Committee and the Creditors' Committee counsel, one representative for each of the Secured Lenders and the Aequitas Receiver and their respective counsel, and Qualified Alternative Bidders and their respective counsel. Only the Stalking Horse Bidder and Qualified Alternative Bidders, including through their counsel, shall be permitted to make any additional bids ("<u>Subsequent Bids</u>") at the Auction.

(2)    All Qualified Alternative Bidders that desire to participate in the Auction shall have its Authorized Representative physically present for all bidding, each with the understanding that the true identity of each Qualified Alternative Bidder shall be fully disclosed to all other Qualified Alternative Bidders and that all material terms, including but not limited to the amount, of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(3)    The Debtors will give the Stalking Horse Bidder, all other Qualified Alternative Bidders, counsel for the Creditors Committee and counsel for the Secured Lenders and the Aequitas Receiver a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids on or before the Business Day prior to the Auction. In addition, the Debtors will inform the Stalking Horse Bidder and each Qualified Alternative Bidder who has expressed its intent to

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 23

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev
Case 16-12879-CMA    Doc 33    Filed 05/31/16    Ent. 05/31/16 17:41:45    Pg. 23 of 32

participate in the Auction of the identity of all Qualified Alternative Bidders that may participate in the Auction.

(4)     Prior to the start of the Auction, the Authorized Representative of each Qualified Alternative Bidder shall certify, in writing, as follows:

(i)     Each bid it makes at the Auction shall, if accepted by the Debtors, constitute a binding and legally enforceable contract of the Qualifying Bidder to timely close a purchase of the Acquired Assets and the assumption of Assumed Contracts according to the terms of the bid in the event an order of the Bankruptcy Court is entered approving a sale based upon such bid.

(ii)    No bids made by the Qualifying Bidder, whether before, or during the Auction, shall be subject to any conditions or contingencies related to due diligence, financing, or any other further approval other than the Authorized Person present at the Auction.

(iii)   The Authorized Representative present for the Qualified Alternative Bidder at the Auction has the full power and authority to act on behalf of and to legally bind such Qualified Alternative Bidder for any bids made, and any agreements entered into at or in connection with the Auction.

(iv)    Other than the Stalking Horse Bidder, each Qualified Alternative Bidder that participates in the Auction shall authorize the Debtors to conditionally accept such Qualified Alternative Bidders second-highest bid at the Auction as a back-up to the high bid, which shall become binding upon and enforceable against such Qualified Alternative Bidder other than the Stalking Horse Bidder, in the event the highest bid is approved by the Court, but such Qualified Alternative Bidder fails or otherwise refuses to close its purchase of the Acquired Assets for any reason other than a material failure of performance by the Debtors.

The Debtors shall have reasonable discretion with respect to the conducting of the Auction and, among other things, may announce at the Auction additional procedural rules that they determine to be reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such additional rules are not inconsistent with these Bidding Procedures and the terms, deadlines, and intent of the Purchase Agreement.

(5)     At the Auction, bidding shall begin with the highest and best Qualified Alternative Bid ("Initial Overbidder").  The Debtors will identify the Initial Overbidder at the beginning of the Auction.  Any subsequent bids

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 24

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev
Case 16-12879-CMA     Doc 33     Filed 05/31/16     Ent. 05/31/16 17:41:45     Pg. 24 of 32

must be at least $75,000 more than the immediately preceding Qualifying Bid and each such increment (including the initial increment over the Purchase Price) must be payable in cash ("Minimum Subsequent Overbid Amount"). In any of its subsequent bids, the Stalking Horse Bidder shall be entitled to credit bid up to the sum of the Break-Up Fee and the EM Consignment Payable, provided that the Stalking Horse Bidder shall recover the sum of the Break-Up Fee and the EM Consignment Payable directly from the deposit paid by the Successful Bidder in the event that the Court enters a sale order authorizing a sale of the Debtors' assets to a buyer other than the Stalking Horse Bidder.

(6)     The Auction shall be recorded by stenographer or other reliable means of preserving the record of the Auction proceedings, and shall continue in one or more rounds of "open cry," or publically announced bidding and shall conclude after each participating bidder has had the opportunity, within any specified time period, to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid, signed by Debtors' counsel and identifying the party or parties making the then highest bid.

(7)     For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the value shall be the net cash consideration payable to Debtors after giving effect to the Break-Up Fee and the EM Consignment Payable that may be payable to the Stalking Horse Bidder under the Purchase Agreement and the Procedures Order, and the contracts and leases and other liabilities of the Debtors that would be assumed or rejected by such bidder, as well as the assets to be excluded, as compared with Acquired Assets, including the Assumed Contracts, and the Assumed Liabilities under the Purchase Agreement.

(8)     At the conclusion of the bidding, Debtors shall announce their determination (pursuant to the following paragraph) as to the Qualified Alternative Bidder submitting the successful highest and best bid ("Successful Bid"), which shall be submitted to the Bankruptcy Court for approval at the Final Hearing. The Stalking Horse Bidder shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, objections, hearings, or other proceedings relating to this Motion, the Purchase Agreement, the Auction, and any Alternative Bid, Subsequent Bid, or the Successful Bid.

(9)     In determining the Successful Bid to submit to the Bankruptcy Court for approval, the Debtors, in consultation with their professionals and the Creditors Committee, shall determine whether an Alternative Bid

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

constitutes higher and better offer than the Purchase Agreement. In making those determinations, the Debtors may consider any and all factors associated with all Qualified Alternative Bids and Qualified Alternative Bidders, including, but not limited to, factors such as the likelihood and ability of proposed buyer(s) to immediately consummate and close the proposed transactions, other timing issues, employment issues, overall value of Qualified Alternative Bids, contracts and leases assumed by each Qualified Alternative Bid and the impact of those issues on the estate and its creditors, and any other material factors. The highest and/or best offer as reasonably determined by Debtors shall be submitted to the Bankruptcy Court for approval at the Final Hearing, subject to the rights of parties in interest, including the Stalking Horse Bidder, to object to or challenge such determination.

(10)     If Debtors do not timely receive any Qualified Alternative Bids, the Debtors shall forthwith cancel the Auction by notice, file a report with the Court's, and promptly present the Sale Order for entry by the Court at the Final Hearing.

(11)     If, following the entry of a Sale Order approving a sale to the Successful Bidder, such Successful Bidder fails or otherwise refuses to consummate such sale, then the next highest or best Qualified Alternative Bid other than the Stalking Horse Bidder as to which the bidder has agreed will stand as a back-up bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder") will be deemed to be the Successful Bid and the Debtors will be obligated to effectuate an Asset Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Bankruptcy Court. If the Stalking Horse Bidder is determined to be the Back-Up Bidder, its obligation consummate a purchase of the Acquired Assets and the Assumed Contracts shall for all purposes be governed by the terms and conditions of the Purchase Agreement. All other Back-Up Bids shall remain open until twenty (20) calendar days following entry of the Sale Order (the "Back-Up Bid Expiration Date"). All Qualified Alternative Bids (other than the Successful Bid and the Back-Up Bid) shall be deemed rejected by the Debtors on and as of the date of entry of the Sale Order by the Bankruptcy Court.

(12)     Notwithstanding Section 7.5.4(b) of the Purchase Agreement, he Deposit of any Back-Up Bidder shall be retained by the Debtors until the Back-Up Bid Expiration Date and returned to the Back-Up Bidder within five (5) business days thereafter or, if the Back-Up Bid becomes the Successful Bid, shall be applied to the Purchase Price to be paid by the Back-Up Bidder in accordance with the terms of the Back-Up Bid.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 26

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2069 20141 ae302h00ev
Case 16-12879-CMA     Doc 33     Filed 05/31/16     Ent. 05/31/16 17:41:45     Pg. 26 of 32

(13) The Successful Bidder's Deposit shall be applied by the Debtors against the payment to the Stalking Horse Bidder of the sum of the Break-Up Fee and the EM Consignment Payable and then, to the cash portion of the Total Purchase Price to be paid by such Person at the closing of the transaction; and, in the event any such Person (whether the Stalking Horse Bidder or a Qualified Alternative Bidder) does not consummate the transaction by reason of its breach of the terms of the purchase agreement such Person has entered into or agreed to enter into with the Debtors, such Deposit shall be retained by the Debtors (in the case of the Stalking Horse Bidder, subject to the Purchase Agreement). Except as provided in subparagraph (12) above, any party that submits a Deposit but otherwise fails to submit a Qualified Alternative Bid or that submits a Deposit and is not the Successful Bidder shall receive a refund of such Deposit as soon as practicable after closing of the transaction with the Successful Bidder (or any backup Qualified Alternative Bidder) (in the case of the Stalking Horse Bidder, subject to the Purchase Agreement).

The proposed Bidding Procedures are in the best interests of the Debtors, their creditors, and their estate. The Bidding Procedures are designed to strike a balance between inviting competing bids and enabling Debtors to close a sale with Stalking Horse Bidder within a reasonable time frame.

A break-up fee of approximately 3% of the anticipated value of the purchase falls squarely within the customary range of such fees. See Harvard Law School Forum on Corporate Governance and Financial Regulation, "Breakup Fees – Picking Your Number," available at https://corpgov.law.harvard.edu/2012/09/11/breakup-fees-picking-your-number/ . Here, the Base Cash Consideration is $6,227,500, plus $450,000 in employment liability, plus an estimated $150,000 of Cure Costs, all subject to a Working Capital Adjustment. The Break-Up Fee of $200,000 is in keeping with the value of the proposed Sale. It is also commensurate with expense, time, and resources committed by the Stalking Horse Bidder thus far. Hamant Sale Decl.

In addition, the Break-Up Fee is supported by the amount of due diligence completed by Early Morning, which interested buyers can now take advantage of in a manner that encourages an active bidding/auction process. Early Morning also incurred and paid the legal and business expenses

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 27

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

associated with the significant negotiating and drafting efforts to reach the final, executed Purchase Agreement. In addition to the normal process and expenses, the intervening Aequitas Receivership caused a shift in the focus of the negotiations between Skagit Gardens and Early Morning. The parties had neared final deal terms, including a draft Asset Purchase Agreement which could be closed outside of a Chapter 11. However, the Aequitas Receivership changed the landscape and meant that a Chapter 11 process would be necessary. This meant a new round of negotiations and redrafting of a new Purchase Agreement, all adding to the cost and resources committed to the deal. Finally, Early Morning communicated early in the negotiations of a § 363 sale that it was not willing to move forward with the negotiations and potential sale process if a break-up fee was not part of the deal.

Here, the Break-Up Fee was an integral part of Stalking Horse Bidder's offer. In fact, Stalking Horse Bidder's offer to purchase the Acquired Assets was and remains conditioned upon this Court's approval of the Break-Up Fee. As such, the assurance of the Break-Up Fee has promoted more competitive bidding because it induced a bid from Stalking Horse Bidder that might otherwise not have been made. The Debtors submit that Stalking Horse Bidder should be reasonably reimbursed for its willingness to assume the role of the "stalking horse" as it is the only party ready and willing to serve in such role. Moreover, Stalking Horse Bidder's offer (including the Break-Up Fee) is also likely to serve as a catalyst to higher bids. Accordingly, Debtors respectfully submit that this Court should authorize and approve the Bidding Procedures, including the Break-Up Fee and the Overbid Protections.

The Bidding Procedures thus are fair, reasonable and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process. Furthermore, debtors often employ bidding protections in order to encourage the making of an original offer subject to higher and/or better offers and ultimately to increase value for the debtor's estate.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 28

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**C.** **Procedures for Assumption and Assignment of Executory Contracts and Leases.**

Pursuant to the Purchase Agreement, the Debtors propose that the following procedures (the "Executory Contract Procedures") shall govern the assumption and assignment of Executory Contracts and Leases.[5]

1. The Assumed Contracts that the Stalking Horse Bidder has elected to be assumed and assigned to it (each, an "Assumed Contract"), will be set forth in Schedule 1 to the Purchase Agreement and subject to amendment as provided in the Purchase Agreement and shall be assumed by the Debtors and assigned to the Stalking Horse Bidder pursuant to the Sale Order.

2. The Stalking Horse Bidder shall assume, pay, satisfy or otherwise discharge the Cure Costs of Assumed Contracts in accordance with the Purchase Agreement (the "Cure Costs Deadline"), *provided, however*, that the Cure Costs Deadline shall be extended to a date five (5) Business Days following the entry of a Bankruptcy Court order resolving any disputed Cure Costs.

3. From the Effective Date of the Purchase Agreement through the Alternative Bid Deadline, the Debtors will not reject or allow for the rejection of any Executory Contract unless otherwise agreed to in writing by the Stalking Horse Bidder.

4. To the extent the Executory Contract Procedures vary from the Purchase Agreement, the Executory Contract Procedures shall control.

5. After the Auction, the Debtors shall have the right to amend the Executory Contract Procedures in accordance with the terms of any purchase agreement signed by the Successful Bidder at the Auction.

---

[5] The Debtors reserve the right to amend the executory Contract Procedures in accordance with the terms of any purchase agreement signed by the prevailing bidder at the Auction in the event that Stalking Horse Bidder is not the prevailing bidder at the Auction.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 29

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

6. Together with the service of the Procedures Order upon all counter-parties (the "Contract Parties") to the Assumed Contracts, the Debtors shall also serve a Notice of Proposed Cure Amounts upon such Contract Parties, together with a copy of the Notice of Debtors' Intent to Assume and Assign Executory Contracts and Unexpired Leases, as well as to all Persons or other entities entitled to notice pursuant to the terms of such Assumed Contracts, notifying all such Persons or entities of the Debtors' proposed cure amounts, if any, for such Assumed Contracts, and the requirement to file a written objection thereto on or before the Objection Deadline.

7. After the Auction, if the Successful Bidder is a party other than the Stalking Horse Bidder, the Debtors will provide immediate notice of the identity of the Successful Bidder to the Contract Parties by email, facsimile, or any method reasonably expected to provide notice in a timely manner.

8. Any Contract Party, or any other party in interest, objecting to the Debtor's proposed Cure Costs, or otherwise objecting to any such Executory Contract being assumed and/or assigned by the Debtors is required to file and serve a written objection specifying the factual and legal bases for such objection (an "Assumption/Assignment Objection"), and setting forth with specificity the Cure Cost that the Contract Party asserts is required to be paid. Any Assumption/Assignment Objection must be filed with the Court and served such that is actually received not later than 5:00 p.m. (PST) on the Bid Deadline by the following: (i) counsel for Debtors, (ii) counsel for the Creditors Committee; (iii) counsel for the Stalking Horse Bidder; and (iv) the UST. Any Assumption/Assignment Objection concerning a purchaser other than the Stalking Horse Bidder may be raised at the Sale Hearing.

9. Failure to Timely File and Serve Assumption/Assignment Objections: Unless an Assumption/Assignment Objection is timely filed and served by a Contract Party or other party in interest by the Bid Deadline, or at the Final Hearing as applicable, the Court may enter an order authorizing or effecting the assumption and assignment of such Executory Contract at the Final Hearing without regard to any objection such party may have.

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 30

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

10. Waiver of Cure Objection: Any Contract Party that fails to file and serve an Assumption/Assignment Objection as provided above shall be deemed to have accepted for all purposes the Debtors' proposed Cure Costs and waived and released any objection to the amount of the same, and shall be forever barred and estopped from asserting or claiming against the Debtors, the Stalking Horse Bidder, or any other Qualified Bidder that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Executory Contract.

11. Objection Hearings: Hearing(s) with respect to Cure Costs and Assumption/Assignment Objections, if any, shall be heard at the Final Hearing, or at such other date as the Court may designate for such objections, in consideration of, and giving effect to the terms and conditions of the Purchase Agreement or any other such agreement approved by the Court pursuant to the Sale Order. If the subject Assumed Contract is assumed and assigned prior to resolution of the Cure Costs, the liquidated cure amount timely asserted by the objecting party, if any (or such lower amount as may be fixed by the Court), shall be deposited by the Debtors into a segregated account pending further order of the Court or agreement of the parties.

12. This Court shall retain jurisdiction over any matters related to or arising from the Motion or the implementation of the Procedures Order.

13. The Procedures Order shall be effective and enforceable immediately upon the entry thereof.

**D.     Waiver of BR 6004(h) Stay**

As discussed throughout this Motion, time is of the essence in completing the sales process and closing a sale. Delay beyond the early part of July will likely cause a decrease in the ultimate value for the creditors. For this reason, the Debtors respectfully request that the Court waive the 14 day stay on closing of a sale, as authorized under BR 6004(h).

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 31

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

### III.   CONCLUSION

Based on the foregoing, the Debtors respectfully request that this Court (i) at the conclusion of the initial hearing on the Motion, enter the Procedures Order substantially in the form attached hereto as Exhibit A; (ii) at the conclusion of the Sale Hearing, enter the Sale Order substantially in the form attached hereto as Exhibit B.

DATED this 31st day of May, 2016.

BUSH KORNFELD LLP


By    /s/ Armand J. Kornfeld
   Armand J. Kornfeld, WSBA #17214
   Christine M. Tobin-Presser, WSBA #27628
   Katriana L. Samiljan, WSBA #28672
Attorneys for Skagit Gardens, Inc. *et al*

MOTION FOR ORDERS RE: ASSET SALE AND BIDDING
PROCEDURES – Page 32

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104